FARRAL C. WARD et al., Appellants, v. MARY J. WARD et al., Appellees.

FEBRUARY 5, 1929.

*E. A. Anderson,* for appellants.

*G. C. Stuart,* for appellees.

EVANS, J.—Frank Ward died suddenly on April 22, 1926. Twenty years before, he had been divorced from his then wife. The plaintiffs herein were the fruit of that marriage. In the divorce controversy, they sided with their mother, and that attitude appears always to have been maintained. Eight or ten years prior to his death, the deceased was married to the defendant Mary J. Ward. Their home was upon a little tract of ground in the outskirts of the town, where deceased was engaged in operating a sawmill and a blacksmith shop. As will hereinafter appear, he was not regarded as a man of means, nor did he take anyone into his confidence as to his business affairs. The charge of false representations made in the petition has no other support in the evidence than a purported conversation between Mary J. Ward and plaintiff Farral Ward. The other plaintiffs acted under the leadership and advice of Farral. Three of the plaintiffs had no conversation whatever with either defendant at any time prior to the execution of the contract. One of the plaintiffs, Mrs. Drake, had a brief conversation of no materiality. But it is contended that, apart from affirmative representation, there was concealment of facts which the defendants were under duty to divulge. This indicates the general nature and scope of the controversy.

The assets of the deceased comprised promissory notes, bank certificates of deposit, Liberty bonds, about $300 worth of exempt personal property, and the homestead. The latter was estimated at $1,000. These assets totaled approximately $10,000. The five plaintiffs sold their interest in the estate to the defendant for $400 each. The large circumstance relied on is the disparity between the purchase price received by the plaintiffs and what they would have received if they had not sold their interest. It appears that among the assets was a note for $2,193, received for purchase money of a farm sold. This note was drawn payable jointly to Frank Ward and his wife, Mary. There were certificates of deposit amounting to $2,900 that were drawn payable to the order of "Frank Ward or Mary J. Ward or the survivor" of them. These certificates were claimed by Mary as her own. These amounts, together with the exempt property and the value of the homestead, reduced the inventory accordingly.

We turn now to the circumstances leading up to the contract

of purchase. Ten days after his father's death, the son Farral called upon the widow, Mary, to inquire about the estate. She gave him what meager information she herself had. His testimony at this point will be set forth later. No affirmative false representation was made by her to him, nor was any contract of sale or purchase in contemplation between them. So far as she knew or expected, the settlement of the estate would take its regular course in the probate court. Farral himself, pursuant to a suggestion from the widow, made certain inquiries and investigations at the banks and at other places. His investigation resulted in the discovery of Liberty bonds to the amount of $350, which were unknown to the widow up to that time. The defendant Floyd Fisk was appointed administrator, and qualified as such on May 2, 1926. This was the day upon which Farral visited the widow. On May 6, 1926, Fisk filed an inventory showing approximately assets to the amount of $6,000. This inventory did not include the bank certificates of $2,900. A few days thereafter, and a few days prior to May 12, 1926, Farral made an offer, for himself and the other heirs, to sell their interest to the widow for $400 each. This offer was made directly, not to the widow, but to Fisk, who communicated it, at Farral's request, to the widow. She decided to accept it, and Fisk so notified Farral. This was some days before the contract was drawn. The inventory was on file. But there were two uncertainties at that time: (1) One was whether there was a will in existence, which might be later discovered; (2) the other was the question of the indebtedness. At the time of the execution of the contract, the plaintiffs sought assurance, in substance, that the contract should not be repudiated if a will should be discovered. On the question of debts, no one knew what the indebtedness might prove to be. It was in contemplation, also, that a substantial expenditure should be made for a monument for the deceased. No will has in fact been discovered. No claims of indebtedness have in fact been filed.

We revert, for the moment, to the testimony of Farral as to his conversation with Mrs. Ward. He testified:

"My father had been buried about a week when I got home. I went out to Mrs. Ward's, and she said she didn't know nothing about my father's business, but did tell me they had sold the farm on the hill to Risbecks. She said she didn't know what he

had done with the money, and I said, 'Let's go up to Risbeck's.' We went up to Risbeck's, and I found out they had sold the farm, and the notes were joint notes,—half of it was hers. Q. What did she say about what knowledge she had of the Risbeck note? A. She said she didn't know nothing about his business at all. She said I ought to know that, cause Frank Ward never told nobody. Mrs. Ward did not make any search for Frank's property, but she let me.''

The same witness testified concerning his father as follows:

''I don't think he ever talked to nobody about his business. Q. You don't think he talked about his business to his wife? A. No, I don't. Q. You don't think she knows much about it? A. No, I don't, nor nobody else. Q. She told you at that time she didn't know much about his business? A. She did. Q. You don't claim that she did, do you? A. I don't believe she did, either. I afterwards went to Mr. Fisk, and inquired about it. She was along. She asked me to go. I didn't know who he was, and she told me. Q. And you inquired of him about your father's property? A. Yes. Q. That was about a week after his death? A. A week or ten days,—something like that. Q. Yes. Mr. Fisk told you he hadn't had an opportunity to find out what all there was that belonged to your father, didn't he? A. Something like that.''

After the acceptance of Farral's offer, the parties all met, on May 12th, in the office of the administrator's attorney, who drew up the agreement in accord with Farral's offer.

Because it was requisite that the husbands and wives of the parties should also sign, the transaction was not completed on that day. All necessary signatures were obtained, however, on or before May 30th, when the contract was put into effect and filed. An amended inventory, including the Liberty bonds discovered by Farral, was filed on May 13, 1926. On the occasion of the meeting in the attorney's office and the signing of the contract there, no questions were asked, and no talk was had between the plaintiffs and either of the defendants. Such is the testimony of the plaintiffs themselves. It is urged by the appellants that the appellees sustained a fiduciary relation towards them, which imposed upon them the duty of protecting the plaintiffs. There was no other duty upon the defendants than that

of the disclosure of the existing facts, so far as they knew them. The plaintiffs were not their wards. They were not under disability. They were contracting on their own account, and after the filing of the inventory, their means of knowledge were exactly equal to those of the defendants. They claim that they did not examine the inventory. But this omission on their part was not induced by the defendants, nor was it known to them, so far as appears. They undoubtedly believed, and so testified, that their father's net estate would be small. One of them testified that she thought she was lucky to get $400. Others testified similarly. This would indicate a fear that indebtedness might take the bulk of the estate. That was a risk which the widow had to take, in making the purchase. There was also the possibility of the existence of a will, which seemed to inspire more fear than hope in the minds of the plaintiffs.

It is to be borne in mind that the plaintiffs' offer was made and accepted within less than a month of the day of the death of the decedent. Rather than to await the eventualities of the regular settlement of the estate, the plaintiffs took the initiative, and actively sought a sure thing. They sought to avoid all future contingencies and to realize immediately. They preferred to take one bird in the hand, rather than to keep two in the bush. They conducted no preliminary negotiations before making their offer. Their offer was the first information communicated to either defendant that they desired an immediate sale of their interest. Nor after the offer were there any representations or negotiations made or had, other than the acceptance thereof. The inventory then on file truly disclosed that their interest in the estate would amount to a much larger sum than they offered to take, unless it were absorbed by claims against the estate, or diverted by the discovery of a will. They have wholly failed to prove fraud, either actual or constructive. The trial court properly dismissed their petition.

The judgment below is, accordingly,—*Affirmed.*

ALBERT, C. J., and FAVILLE, KINDIG, and WAGNER, JJ., concur.